Filed 12/12/22  P. v. Rivera CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUNIOR RIVERA,<br><br>    Defendant and Appellant. | 2d Crim. No. B309474<br>(Super. Ct. No. BA463515)<br>(Los Angeles County) |

Junior Rivera appeals from the judgment after the jury convicted him of first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a), count 1), reckless driving while evading a police officer (Veh. Code, § 2800.2; count 2), unlawful firearm activity (§ 29820, subd. (b); count 4), and misdemeanor firearm theft (§ 487, subd. (d)(2); count 5).  For count 1, the jury found true that Rivera committed murder to benefit a criminal street gang pursuant to section 186.22, subdivision (b)(1)(C), and

---

[1] Further unspecified statutory references are to the Penal Code.

personally used and discharged a firearm causing death within the meaning of section 12022.53, subdivisions (d) and (e)(1). On counts 2 and 4, the jury also found true the gang enhancement pursuant to section 186.22, subdivision (b)(1)(A).

The trial court sentenced Rivera to 50 years to life for count 1 (25 years to life for first degree murder plus 25 years to life for personally discharging a firearm causing death), a consecutive five-year term on count 2 (two years for reckless driving plus three years for the gang enhancement), and a concurrent five-year term on count 4 (two years for unlawful firearm activity plus three years for the gang allegation). On count 5, the court ordered Rivera to serve 364 days in county jail to run consecutively to count 1.

Rivera contends Assembly Bill No. 333 (Stats. 2021, ch. 699, §§ 1-5) (Assembly Bill 333) requires that we vacate the section 186.22 gang enhancement on counts 1, 2, and 4, and the section 12022.53, subdivision (e)(1) firearm enhancement on count 1, and remand for a trial on these enhancements. Rivera also contends the gang enhancement must be reversed because the prosecution's expert relied on inadmissible hearsay, and the abstract of judgment and sentencing order should be amended to correct clerical errors.

We vacate the gang enhancement (§ 186.22, subd. (b)) on counts 1, 2, and 4, the firearm enhancement (§ 12022.53, subd. (e)(1)) on count 1, and remand to allow retrial pursuant to Assembly Bill 333. Upon resentencing, the court shall correct clerical errors in the abstract of judgment and the sentencing order. In all other respects, the judgment is affirmed, including the conviction for first degree murder and true finding that Rivera personally discharged a firearm.

2

## FACTUAL AND PROCEDURAL HISTORY
### *Murder of J.M.*

In December 2017, Los Angeles Port Police Officer Alfonso Garcia discovered that his firearm and loaded magazines were stolen from his truck. The officer found a small flashlight that did not belong to him.

Four days later, a witness heard a commotion near his backyard and saw J.M., a member of the White Fence gang, running through an alley. The witness saw a black two-door Infiniti G35 stop outside the backyard and saw Rivera get out of the passenger side. Rivera, who was a member of the rival Boyle Heights 13 gang, chased J.M. and fired a gunshot; J.M. fell. Rivera then approached "close range" to J.M., stood over him, and shot him four or five times in the back. Rivera ran back to the car and drove away.

J.M. suffered from multiple gunshot wounds and died from his wounds.

### *Arrest and investigation*

Surveillance cameras near the site of the shooting recorded J.M. walking through an alley and the Infiniti driving through a minute later. The footage captured the license plate numbers on the Infiniti.

Two days later, codefendant Geovanni Lezama was arrested at his home as he was getting into his black Infiniti. His license plate numbers matched the ones from the surveillance video. During a search of Lezama's home, officers found a notebook with Boyle Heights 13 gang-related graffiti in it.

Lezama was placed in a cell with an undercover agent. Lezama told the agent that he was 13 years old when he became a gang member, but "got out" of the gang about nine months

3

before the shooting.  He showed the agent a "BHTS" tattoo on his head.  He said he was shot by a White Fence gang member two years prior and hated those gang members.

Lezama told the agent that he had a two-door Infiniti G35. On the day of the shooting, he wanted to drive around to look for White Fence Gang members and he "forced" Rivera to go with him.  While driving, they saw a person with a White Fence gang tattoo.  He said Rivera was the shooter and used a gun that he stole from a "cop car."  Lezama said he did not get out of his car during the shooting.

Rivera was arrested the next day.  On the day of his arrest, Rivera fled from police officers who were attempting a traffic stop of his car.  Rivera drove onto the freeway, abandoned his vehicle, and fled on foot before he was caught by police officers.

Rivera was placed in a cell with an undercover agent and told the agent "I'm going down for murder."  Rivera said the shooting happened "a couple days ago" and that his "stupid ass homie got caught and now everybody else is getting caught."  He believed his companion "ratted [him] out," and said the plan was his companion's idea.

Rivera said his companion was arrested at his home.  He said he "told his stupid ass to get rid of that car, and he still wanted to drive it."  He said his companion drove a "two-door Infinit[i]" and "there aren't too many of those" in Boyle Heights.

Rivera said the shooting took place in the "White Fence's neighborhood."  Rivera said he used a "cop gun" he stole from a "cop car" in Highland Park.  He acknowledged the victim died. When asked about the gun, Rivera said he "got rid of [the gun] already."  Rivera said much of his gang "went their own way" and

that the remaining 15 members were "over here . . . putting in their work."[2]

After learning Rivera used a firearm that was stolen from a police officer, officers investigated the burglary of Officer Garcia's gun and ammunitions. Officer Garcia provided the officers with two spent cartridges to compare to the bullet fragments and cartridges found near J.M.'s body. A forensic analysis revealed the cartridges provided by Officer Garcia and the cartridges from the shooting were fired from the same gun. The officers also conducted a D.N.A. analysis on the flashlight found in Officer Garcia's car. The analysis showed D.N.A. matching Rivera's D.N.A. on the flashlight.

*Statements from Vargas and Lizarraga*

Natalie Vargas knew Lezama and Rivera. She believed Lezama was a Boyle Heights 13 gang member because of the "BHTS" tattoo on his head. Vargas met with Rivera the day after the shooting. Rivera told her that he, Lezama, and another companion, Arturo Lopez (known as "Boxer"), were driving in Lezama's car on the day of the shooting when they saw a person with a White Fence face tattoo. When Lopez asked where that person was from, the person replied, "White Fence." Rivera said they shot the person. Rivera told Vargas that he and Lopez were both shooters and that the shooting was Lezama's idea. He said he used a stolen "cop's gun."

Alma Lizarraga was previously in a romantic relationship with Lopez. During an interview with police officers, she said Lezama, Rivera, and Lopez went "cruising." Lezama and Rivera were in Lezama's car and Lopez drove another car. Rivera

---

[2] "Putting in work" means to commit crimes for the gang, which includes a "shooting, a robbery, or a murder."

identified a White Fence gang member by his tattoo, and he shot him.

*Gang expert testimony*

A gang expert testified he was assigned to monitor gangs, including the Boyle Heights 13 and White Fence gangs. He explained these gangs have a "rivalry," which stem from a fight over territory. The Boyle Heights 13 gang controlled a "very small" area and had approximately 20 members. Their territory was within the territory controlled by the White Fence gang. The White Fence gang controlled a large area and had approximately 350 members. J.M.'s murder occurred within the White Fence territory.

Five months before J.M.'s murder, the expert participated in the arrest and investigation of a stabbing of another Boyle Heights 13 gang member, Ryan Ramirez, perpetrated by multiple White Fence gang members. The stabbing occurred at a location within "disputed [gang] territory."

The expert testified the primary activities of the Boyle Heights 13 gang include "weapon possession, vandalism, grand theft auto" and robberies. He knew Lezama and Rivera through past contacts. He knew Lezama's gang moniker was "Goofy," and Rivera's moniker was "Minor." He was also familiar with Lopez ("Boxer") and Ramirez ("Puppy"). He opined that all four of these individuals were Boyle Heights 13 gang members.

The expert identified Lezama in photographs in which he posed with several Boyle Heights 13 gang members. He was familiar with the gang members in the photographs and had arrested some of them. In one photograph, Lezama and five other gang members held up hand signs associated with the Boyle Heights 13 gang. In one photograph from Rivera's

6

Instagram account, Rivera had three pistols and displayed the Boyle Heights gang signs with his hands.

The prosecution presented several photographs of Lezama's tattoos, including a "BHTS" tattooed on Lezama's stomach and the back of his head. The expert testified these tattoos were associated with the Boyle Heights 13 gang. Lezama also received a new tattoo while he was awaiting trial. The expert opined that getting a new gang tattoo was evidence of his "full intent to remain active in the gang."

The prosecution presented the expert with evidence of predicate offenses of two Boyle Heights 13 gang members. The evidence included certified court records establishing a 2015 weapon possession conviction for Ryan Ramirez and a 2016 concealed firearm conviction for Ricky Valencia, two fellow gang members.

The expert opined that based on a hypothetical with facts similar to J.M.'s murder, the murder was committed to benefit the Boyle Heights 13 gang. He opined the murder was perpetrated by the gang because two of its members were "together when they committed the crime." He also opined the murder benefited the gang: "[T]his crime is a perfect example of how it benefits the gang. It instills fear and intimidation within the community. It makes it known to other gang members and rival gang members that this gang is willing to commit these ruthless acts of violence. And it enhances their gang's reputation overall as one that is violent and is able and willing to commit these kind[s] of crimes."

*Verdict and sentencing*

The jury convicted Rivera of first degree murder (§§ 187, subd. (a), 189, subd. (a), count 1), reckless driving while evading a

7

police officer (Veh. Code, § 2800.2; count 2), unlawful firearm activity (§ 29820, subd. (b); count 4), and misdemeanor firearm theft (§ 487, subd. (d)(2); count 5). On counts 1, 2, and 4, the jury found true that Rivera committed these crimes to benefit a criminal street gang (§ 186.22, subds. (b)(1)(A) & (C)). Also on count 1, the jury found true Rivera personally used and discharged a firearm causing death within the meaning of section 12022.53, subdivisions (d) and (e)(1).

On count 1, the trial court sentenced Rivera to 50 years to life (25 years to life for murder, plus 25 years to life for the § 12022.53, subds. (d) and (e)(1) firearm enhancements). On count 2, the court sentenced him to a consecutive five-year term (two years for reckless driving, plus three years for the gang enhancement (§ 186.22, subd. (b)(1)(A)). On count 4, the court imposed a concurrent term of five years (two years for unlawful firearm activity, plus three years for the gang enhancement (§ 186.22, subd. (b)(1)(A)). On count 5, the court ordered Rivera to serve 364 days in county jail to run consecutively to count 1.

DISCUSSION

*Assembly Bill 333*

Rivera contends, and the Attorney General concedes, he is entitled to the ameliorative benefits of Assembly Bill 333, effective January 1, 2022. We agree.

Assembly Bill 333 amends section 186.22 in several ways. (Stats. 2021, ch. 699, § 3.) It modifies the definitions of "pattern of criminal gang activity" and "criminal street gang" and clarifies the evidence required to show a benefit to a criminal street gang. It increases the threshold for conviction of the offense and imposition of the enhancement. In addition, Assembly Bill 333 added section 1109, which provides, that if "requested by the

8

defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases." (§ 1109, subd. (a).)

As relevant here, Assembly Bill 333 amends the law regarding predicate offenses. Now, "(1) the offenses must have 'commonly benefited a criminal street gang' where the 'common benefit . . . is more than reputational'; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense. (Assem. Bill 333, § 3, amended § 186.22, subd. (e)(1)–(2), eff. Jan. 1, 2022.) With respect to common benefit, the new legislation explains: '[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.' (Assem. Bill 333, § 3, amended § 186.22, subd. (g), eff. Jan. 1, 2022.)." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*).)

The parties agree, as do we, that Assembly Bill 333's amendments affecting predicate offenses apply retroactively to judgments of conviction that are not yet final. (*In re Estrada* (1965) 63 Cal.2d 740, 744; *Lopez*, *supra*, 73 Cal.App.5th at pp. 344-345.) The Attorney General concedes that "there was no evidence presented that [Ramirez's] or Valencia's predicate offenses benefited [the] Boyle Heights gang in a way that was

9

more than reputational" and that "remand is required."  Thus, the proper remedy is to vacate the true finding on the section 186.22, subdivision (b) gang enhancement.

The Attorney General agrees that vacating the section 186.22, subdivision (b) gang enhancement would also "undo the section 12022.53 subdivision (e)(1)" firearm enhancement. However, because the jury found that Rivera personally and intentionally discharged a firearm, causing death pursuant to section 12022.53, subdivision (d), the Attorney General maintains Rivera is still subject to the same consecutive 25-year-to-life sentencing enhancement.  We agree.

Unlike section 12022.53, subdivision (e)(1), which requires a finding that a person "violated subdivision (b) of Section 186.22," section 12022.53, subdivision (d) does not require such a finding for the 25-year-to-life sentencing enhancement to apply. Under subdivision (d), a person who "personally and intentionally discharges a firearm" and proximately causes great bodily injury or death "shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."  In contrast, subdivision (e)(1) applies to a principal only if *both* of the following are met: "(A) The person violated subdivision (b) of Section 186.22" and "(B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

Here, because Rivera personally and intentionally discharged a firearm causing the death of J.M., the 25 year-to-life enhancement remains intact.  (See *Lopez*, *supra*, 73 Cal.App.5th at pp. 347-348 [the firearm enhancements on two counts of murders where the jury found true that the defendant personally and intentionally discharged a firearm pursuant to section

10

12022.53, subdivision (d), which carry the same penalty, remain intact].)

Rivera contends that we must reverse his convictions because they were not tried separately from the gang enhancement, as required by section 1109. (*People v. Burgos* (2022) 77 Cal.App.5th 550, 568-569, review granted July 13, 2022, S274743.) The Attorney General argues that section 1109 does not apply retroactively. (*People v. Perez* (2022) 78 Cal.App.5th 192, review granted Aug. 17, 2022, S275090; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 64-65, review granted Aug. 17, 2022, S275341.) There is a split of authority on whether section 1109 applies retroactively to nonfinal cases. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208.) We need not decide this issue. Even assuming retroactivity, Rivera cannot show it is "reasonably probable" he would have obtained a more favorable result if his trial had been bifurcated. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Tran*, at pp. 1209-1210 [applying *Watson*]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 (*E.H.*).)

First, some of the gang evidence would have been admissible because it was relevant to the underlying offenses. (See *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132 ["nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges"].) The gang evidence here was relevant to prove motive—the prosecution presented evidence that the murder was related to a gang rivalry between the Boyle Heights 13 and White Fence gangs and that the murder was retaliatory.

Second, there was overwhelming evidence supporting the convictions. With respect to murder, both Rivera and Lezama admitted to the informant that they participated in the murder.

11

Lezama said Rivera was the shooter, and Rivera admitted that he used a "cop gun" he stole from a "cop car" in Highland Park. Lizarraga said Rivera was the shooter, and Vargas testified that Rivera said he was one of the shooters and used a stolen gun. With respect to the reckless driving conviction, the evidence established Rivera fled from police officers, drove onto the freeway, and fled on foot before he was caught. With respect to the firearms charges, Rivera stipulated that he was prohibited from possessing a firearm, admitted stealing a "cop gun," and admitted using the gun. Rivera's D.N.A. was also found at the site from where the gun was stolen. "Under these circumstances, we conclude that the jury's verdict was based on the evidence, not improper bias, and that bifurcation would not have helped [Rivera]." (*E.H.*, *supra*, 75 Cal.App.5th at p. 480.)[3]

In conclusion, the proper remedy is to vacate the section 186.22 gang enhancement and the section 12022.53, subdivision (e)(1) firearm enhancement and remand to allow the prosecution an opportunity to retry these enhancements and meet its burden of proof pursuant to Assembly Bill 333's new requirements. (See *Lopez, supra,* 73 Cal.App.5th at p. 346.) [4]

---

[3] Because we remand on the grounds that Assembly Bill 333 applies, we need not address Rivera's contention regarding the gang expert's reliance on inadmissible hearsay nor his contention that his counsel rendered ineffective assistance of counsel by failing to object.

[4] Although the parties agree the new evidentiary provisions in Assembly Bill 333 retroactively apply, the Attorney General contends there was sufficient evidence that the Boyle Heights 13 gang was an "ongoing, organized association" pursuant to section

*Abstract of judgment and sentencing order*

Rivera contends, and the Attorney General concedes, the abstract of judgment and sentencing order contain several clerical errors requiring correction. We agree.

First, the abstract of judgment, which states that count 4 is a consecutive five-year sentence, should be corrected to reflect a *concurrent* five-year sentence. Here, because the court orally pronounced that the five-year sentence for count 4 would run concurrent to the sentence for count 2, the abstract of judgment should be corrected to accurately reflect the orally pronounced sentence. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

Second, the parties agree the abstract of judgment and sentencing minute orders, which state that the gang enhancement (§ 186.22, subd. (b)(1)(C)) for count 1 was stayed, should be corrected to reflect that the enhancement was *stricken*. "Penal Code section 186.22, subdivision (b) establishes alternative methods for punishing felons whose crimes were committed for the benefit of a criminal street gang. Section 186.22, subdivision (b)(1)(C) . . . imposes a 10-year enhancement when such a defendant commits a violent felony. Section 186.22, [subdivision] (b)(1)(C) does not apply, however, where the violent felony is 'punishable by imprisonment in the state prison for life.' (Pen. Code, § 186.22, subd. (b)(5).)" (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.) Where, as here, the defendant is sentenced to an indeterminate life term, the trial court should strike the 10-year gang enhancement. (*Id*. at p. 1011.) If on remand, the gang

---

186.22, subdivision (f). Given our decision to remand, we need not address this issue.

enhancement is found true, the enhancement on count 1 should be stricken rather than stayed.

Third, Rivera was ordered to pay $7,340.85 to the California Victim Compensation Board. The abstract of judgment and sentencing minute order reflect that the Victim Compensation Board is a direct "victim," rather than a "Restitution Fund." The abstract of judgment and sentencing order should be corrected to state that the Board is a "Restitution Fund," and not a direct victim.

## DISPOSITION

The gang enhancement pursuant to section 186.22, subdivision (b) on counts 1, 2, and 4 and the firearm enhancement pursuant to section 12022.53, subdivision (e)(1) on count 1 are vacated. The matter is remanded to allow the prosecution the opportunity to prove these enhancements pursuant to Assembly Bill 333. The judgment is otherwise affirmed, including the first degree murder conviction and true finding that Rivera personally and intentionally discharged a firearm that proximately caused death within the meaning of section 12022.53, subdivision (d). Upon resentencing, the court shall correct the errors in the abstract of judgment and sentencing order as discussed in this opinion.

NOT TO BE PUBLISHED.

BALTODANO, J.

We concur:

GILBERT, P. J.                    YEGAN, J.

14

Eleanor J. Hunter, Judge

Superior Court County of Los Angeles

_____

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Blythe J. Leszkay and Nikhil Cooper, Deputy Attorneys General, for Plaintiff and Respondent.